UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

_____

In re:

     PAUL ROSA, INC.
     d/b/a Rosa's Home Stores
     a/k/a Rosa's Superstores
     a/k/a Rosa's Home Center,

                       Debtor.

Case No. 10-15205
Chapter 11 Case

_____

## AFFIDAVIT OF DEAN RALLO IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY MOTIONS

STATE OF NEW YORK  )
COUNTY OF ERIE      )  ss.:

     Dean J. Rallo, being duly sworn, hereby deposes and says:

     1.     I am the president of Paul Rosa, Inc. d/b/a Rosa's Home Stores a/k/a Rosa's

Superstores a/k/a Rosa's Home Center (the "Debtor"), the debtor and debtor in possession in the

captioned chapter 11 case.  In my capacity as president, I have overall responsibility for all

aspects of the Debtor's business and operations.

     2.     I submit this Affidavit in support of the first day applications and motions filed by

the Debtor as of December 9, 2010 (the "Petition Date")[1].  Except as otherwise indicated, all

facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant

documents, my opinion, my experience and knowledge of the Debtor's operations and financial

condition, or are based upon knowledge of employees of the Debtor reporting to me that are

_____

[1] All capitalized terms used but not defined herein shall have the same meanings ascribed to them in the relevant applications and motions.

1780018.1 12/9/2010

derived in the course of his/her duties. If I were called upon to testify, I could and would testify to the facts set forth herein. I am authorized on behalf of the Debtor to submit this Affidavit.

3. Part I of this Affidavit describes the Debtor's business and the circumstances surrounding the filing of its chapter 11 petition. Part II of this Affidavit sets forth the relevant facts in support of the various first day applications and motions filed by the Debtor contemporaneously herewith.

## PART I - BACKGROUND

4. On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, §§ 101, *et seq.*, as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York.

5. The Debtor remains in possession of its assets and continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. The Debtor is a closely-held New York corporation with an office located at 2331 Union Road, Cheektowaga, New York 14227 and is the largest independent retailer of high quality, name brand home furnishings and accessories, mattresses, appliances and consumer electronics in Western New York. The Debtor is a family-owned and operated company that was founded by Paul Rosa in 1981 that currently operates four retail stores in the Buffalo area under the trade name "Rosa's Home Stores": (i) 3770 Union Road, Cheektowaga, New York; (ii) 2409 Military Road, Niagara Falls, New York; (iii) 1400 McKinley Mall, Hamburg, New York; and (iv) 2880 Sheridan Drive, Tonawanda, New York (collectively, the "Retail Stores"). The Debtor also operates "Rosa's Warehouse Outlet" at 2335 Union Road, Cheektowaga from which it sells overstocks, buyouts, discontinued items and floor models at discount prices.

1780018.1 12/9/2010

7.      Currently, the Debtor has 68 active employees. All of the employees are full-time. None of the Debtor's employees are unionized.

8.      Since early 2009, the Debtor's revenue has declined significantly due to increased competition from national and regional "big box" retailers, especially with respect to appliances and consumer electronics, and due to the general, sustained downturn in the local economy. For the nine months ending September 30, 2010, the Debtor experienced a pre-tax loss of $1,069,175. During the past several months, the Debtor explored all available options in an effort to reorganize its financial affairs, including seeking refinancing, new capital contributions, the sale of some assets and/or the liquidation of certain stores and assets. The Debtor met with bankers and sought out new investors and discussed refinancing with other lenders. The Debtor also engaged the financial restructuring firm of J.C. Jones & Associates to assist with its reorganization efforts. The Debtor also attempted to restructure its financial situation by reducing expenses and making other operational adjustments. These adjustments, however, have not produced the required amount of relief, and it is unlikely that the adjustments will result in any sufficient recovery given the current economic conditions in Western New York. Consequently, the Debtor has determined that its retail business is no longer viable. Absent chapter 11 relief, the Debtor projects that it will not have sufficient cash flow to continue its operations past December 31, 2010.

9.      As of the Petition Date, the Debtor was indebted to First Niagara Bank under a Demand Grid Note dated November 30, 2005 in the approximate amount of $3,500,00 and owed approximately $2,200,000 to trade vendors. No property of the Debtor is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor or agent for any such person.

3

1780018.1 12/9/2010

10.     In addition to attempts to obtain financing, capital contributions and restructure its financial affairs, the Debtor requested proposals from different liquidation companies. After discussions with such liquidation companies, the Debtor determined that the proposal from Planned Furniture Promotions, Inc. ("PFP") was the highest and best proposal and will result in the greatest return to the Debtor's estate and its creditors, both secured and unsecured.

11.     As a result of extensive negotiations, the Debtor and PFP entered into a Sale Promotion Consulting Agreement dated December 3, 2010 (the "Agreement") for the liquidation of the Debtor's inventory (the "Company Inventory") and the fulfillment of certain pending customer orders. The purpose of the Debtor's chapter 11 filing is to wind down the Debtor's operations in a controlled and orderly fashion for the benefit of its creditors and to complete as many customer orders as possible.

## PART II - FIRST DAY MOTIONS

**A.     Application for Orders Pursuant to Sections 327(a) of the Bankruptcy Code Authorizing the Retention of Bond, Schoeneck & King, PLLC as Attorneys for the Debtor and Debtor in Possession**

12.     The Debtor has selected the law firm of Bond, Schoeneck & King, PLLC ("BS&K") to act as its attorneys in connection with the prosecution of its chapter 11 case.

13.     Due to BS&K's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its specialized and substantial expertise in corporate, litigation, labor, pension and real estate law, I believe that BS&K is highly qualified to assist the Debtor with the intricate legal issues likely to arise in this chapter 11 case. BS&K also represented the Debtor during the pre-petition period. As a result, I believe it is efficient and necessary to continue to utilize BS&K's services.

4

1780018.1 12/9/2010

14.     Prior to the Petition Date, the Debtor consulted extensively with BS&K with respect to, among other things, the preparation, commencement and prosecution of this case. Through such consultations, BS&K has become familiar with the Debtor's business and legal affairs. Furthermore, the members and associates of BS&K who will advise the Debtor in this case have considerable knowledge and experience in the field of bankruptcy law and debtors' and creditors' rights, including insolvencies, restructurings and business reorganizations and liquidations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to this chapter 11 case.

15.     If retained, BS&K will render the following services, without limitation, on the Debtor's behalf:

(a)     advising the Debtor with respect to its powers and duties as a debtor and debtor in possession in the continued management and operation of its business and assets;

(b)     attending meetings and negotiating with representatives of creditors and other parties in interest, including First Niagara Bank, and advising and consulting on the conduct of the case, including all of the legal and administrative requirements of operating in chapter 11;

(c)     taking all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions commenced under the Bankruptcy Code on its behalf, and objections to claims filed against the estate;

(d)     preparing on behalf of the Debtor all motions, applications, answers, orders, reports and papers necessary to the administration of the estate;

(e)     negotiating and preparing on the Debtor's behalf a plan of liquidation, disclosure statement and all related agreements an/or documents and taking any necessary action on behalf of the Debtor to obtain confirmation of such plan;

(f)     advising the Debtor with respect to sales of assets;

(g)     appearing before this Court, any appellate courts, and the U.S. Trustee, and protecting the interests of the Debtor's estate before such courts and

1780018.1 12/9/2010

the U.S. Trustee;

(h)    performing all other legal services in connection with this chapter 11 case.

16.    BS&K has indicated its willingness to act in this case as the Debtor's attorneys and to render the foregoing services. The Debtor has agreed to pay BS&K compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by BS&K. I believe the fees that BS&K will charge the Debtor, as set forth in the Affidavit of Camille W. Hill, Esq. filed in support of BS&K's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and BS&K's extensive experience and the scope of the work to be performed pursuant to this retention.

17.    I believe that BS&K is well qualified to represent the Debtor as a debtor in possession in this chapter 11 case and that the retention of BS&K is necessary and in the best interests of the Debtor, its estate and its creditors. Accordingly, the Debtor respectfully requests that the Court issue an Order approving the appointment of BS&K to act as the attorneys to the Debtor herein.

**B.    Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 345(b) and 363(c)(1) Authorizing (I) Continued Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System and (III) Continued Use of Existing Business Forms**

18.    A list of the Debtor's bank accounts (collectively, the "Bank Accounts") is provided in Exhibit "A" attached to the Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 345(b) and 363(c)(1) Authorizing (i) Continued Maintenance of Existing Bank Accounts, (ii) Continued use of Existing Cash Management System and (iii) Continued Use of Existing Business Forms dated December 9, 2010 (the "Bank Account Motion"). The Bank Accounts are held at First Niagara Bank and KeyBank, N.A. (collectively, the "Banks").

6

1780018.1 12/9/2010

19.     The Bank Accounts and the Debtor's practices and procedures with respect to the collection of deposits, making disbursements and making payroll constitute the Debtor's centralized cash management system (the "Cash Management System"). As described in the Bank Account Motion, the Debtor maintains several bank accounts that are integrated to form the Debtor's Cash Management System. The Debtor makes the majority of payments related to general operations from the Operating Account. Certain of the Debtor's other accounts are designated as payroll accounts, reserve accounts and various other accounts as indicated on Exhibit "A" to the Bank Account Motion.

20.     As of the Petition Date, the Debtor will instruct its Banks to stop payment on all outstanding checks issued to vendors or other trade creditors on account of prepetition debts or liabilities, with the exception of those checks to employees for wages and/or employee benefits, as described more fully in the Motion for Order (I) Authorizing Debtor to Pay Prepetition Wages, Salaries, Commissions and Benefits, (II) Authorizing Continuation of Employee Benefit Programs in the Ordinary Course of Business and (III) Directing all Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary and Benefit Obligations dated December 8, 2010 (the "Employee Wage Motion").

21.     Pursuant to the standard chapter 11 operating practice in this jurisdiction, the Debtor is required, among other things, to open new bank accounts upon the filing of the bankruptcy petition and are further required to designate such accounts as "Debtor in Possession" on the respective account signature cards.

22.     The Debtor's existing Cash Management System is essential to the ordinary coordination of the Debtor's business. The Debtor submits that the cost and expense of changing the Bank Accounts and creating a new cash management system would not only force the Debtor

1780018.1 12/9/2010

to incur significant and unnecessary costs and expenses, but would impair the operation of the Debtor's business.

23. Indeed, forcing the Debtor to employ a new cash management system could cause confusion, diminish the prospects for a successful reorganization, disrupt payroll, introduce inefficiency, at a time when efficiency is most critical, and place a strain on the Debtor's relationships with customers and vendors. Naturally, these relationships must be maintained if the Debtor is to be given the opportunity to reorganize successfully. Asking third-party payors, such as credit card companies, to remit payments to new and different accounts will result in a significant slowdown in the Debtor's collection of receipts just at the time when prompt collection of much-needed cash is most critical.

24. Further, the preservation of the Bank Accounts will not adversely impact any of the Debtor's creditors. The Banks at which the Debtor's primary Operating and depository accounts are located have been designated as Authorized Depositories by the Office of the United States Trustee for the Western District of New York (the "Authorized Depositories").

25. The Debtor seeks to prohibit and enjoin the Banks from honoring all prepetition checks, except as expressly set forth herein. As noted above, and in the Employee Wage Motion, filed contemporaneously herewith, the Debtor requests that the Court direct the Debtor's Banks to continue to honor payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued. Such relief is necessary to implement, to the extent granted, and shall be subject to, the relief requested by the Debtor in the Employee Wage Motion. The Debtor intends to provide notice of entry of the order granting the Bank Account Motion to the Debtor's Banks within one (1) business day of the entry of such an order.

1780018.1 12/9/2010

26.     Finally, the Debtor also requests permission to use its existing business forms and stationery without alteration or change. The Debtor does not print its own business forms and stationery. Thus, substantial time and expense would be required if the Debtor was required to print new business forms and stationery merely to indicate "debtor in possession" postpetition, the Debtor intends to execute new signature cards with respect to its Bank Accounts to indicate "debtor in possession." The Debtor will also stamp all checks "DIP" or "Debtor in Possession" postpetition.

27.     Based upon all of the foregoing, the Debtor submits that sufficient cause exists to allow the Debtor to maintain its existing bank accounts, cash management system and business forms and respectfully requests that it be authorized to continue using its current cash management system and business forms during the post-petition period.

**C.     Motion for Order (I) Authorizing the Debtor to Pay Prepetition Wages, Salaries, Commissions and Benefits, (II) Authorizing Continuation of Employee Benefit Programs in the Ordinary Course of Business and (III) Directing All Bank to Honor Prepetition Checks for Payment of Prepetition Wage, Salary, Commission and Benefit Obligations.**

28.     To avoid the significant risks of resignations and of discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtor be granted authorization requested in the Employee Wage Motion. The Debtor requires that continued service of its employees in order to ensure that the continuity and quality of its business operations will not be threatened and so that the Debtor may continue, without unnecessary interruption, its efforts to achieve a successful reorganization.

1780018.1 12/9/2010

29. The Debtor currently has a total of 68 full-time employees (collectively, the "Employees"). All of the Employees are paid bi-weekly, in arrears. Based upon historical data, the average monthly payroll for the Employees is approximately $186,000.00 .

30. As of the Petition Date, the accrued, unpaid payroll for all Employees is approximately $79,714.00. The next regularly-scheduled pay date for all Employees is December 10, 2010. The portion of the wages earned by the Employees prior to the Petition Date constitute prepetition wages which will be paid on December 10, 2010, the next regularly-scheduled payroll date. Therefore, it is imperative that the Debtor obtain authorization to pay priority prepetition wage claims to all of its Employees on or before December 10, 2010.

31. No Employees are currently owed amounts that are under the $11,725.00 cap on priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

32. Accordingly, the Employee Wage Motion seeks authority to pay accrued but unpaid prepetition wages due all Employees through the Petition Date. The Debtor seeks to pay the wages for all Employees in the ordinary course when the first obligations come due on December 10, 2010, including obligations that are not yet due.

33. In addition, in the ordinary course of its business, the Debtor provides benefits to its Employees (collectively, the "Employee Benefits"). The Employee Benefits to Employees include, without limitation, health insurance, dental insurance, workers' compensation, disability and related programs.

34. The payroll and Employee Benefits for the Employees for the above-mentioned periods is less than $11,725.00 for each Employee in all circumstances.

10

1780018.1 12/9/2010

35.     The Debtor further requests that this Court authorize the Banks to process, honor and pay all prepetition checks issued by, and fund transfer requests made from, the Debtor with respect to Employee wages and Employee Benefits that were not processed, honored or paid as of the Petition Date.

36.     Finally, the Debtor routinely withholds from Employee paychecks amounts that the Debtor is required to transmit to third parties. Examples of such withholding include Social Security, FICA, federal, state, and local income taxes, garnishments, health care payments, 401k contributions and charitable donations. Such withheld funds, to the extent that they remain in the Debtor's possession, constitute monies held in trust and, therefore, are not property of the Debtor's bankruptcy estate. I respectfully submit that the Debtor's practice of directing such funds to the appropriate parties is in the ordinary course of business, and the Debtor is seeking authority to continue such practice.

37.     The obligations for which the Debtor seeks authorization to honor to its Employees were earned by individuals employed by the Debtor, and are for services rendered within one hundred and eighty (180) days before the commencement of the Debtor's case. The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

38.     The relief requested pursuant to the Employee Wage Motion will not prejudice creditors, but rather will protect their interests.

1780018.1 12/9/2010

**D.** **Debtor's Motion for an Emergency Order (A) Authorizing the Debtor to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (B) Authorizing the Debtor to Grant Adequate Protection to Prepetition Secured Party Pursuant to 11 U.S.C. §§ 361, 362, and 363, and (C) Scheduling Interim and Final Hearings Pursuant to Bankruptcy Rule 4001**

39.     The Debtor filed a Motion requesting that this Court enter an Order (a) authorizing the Debtor to utilize cash collateral pursuant to section 363 of the Bankruptcy Code, (b) authorizing the Debtor to grant adequate protection to a prepetition secured party pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and (c) scheduling an interim hearing and a final hearing concerning the Motion pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Motion"). As I understand, by the Cash Collateral Motion, the Debtor seeks to use the cash collateral of First Niagara Bank, its prepetition secured lender, which arises according to the transaction described below:

        **i.**     **Debtor's Line of Credit Agreement with First Niagara Bank**

40.     Prior to the Petition Date, the Debtor and First Niagara Bank ("FNB"), entered into a certain Demand Grid Note dated as of November 30, 2005 (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "FNB Loan Agreement") and related loan documents in connection therewith (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "FNB Loan Documents"), pursuant to which FNB claims a first priority lien on, and security interest in, all of the Debtor's present and future assets, including, without limitation, accounts receivable, inventory, equipment, fixtures and general intangibles and proceeds associated therewith (collectively, the "Prepetition Collateral"). As such, FNB claims a perfected first-priority security interest in the Prepetition Collateral.

1780018.1 12/9/2010

41. FNB duly perfected its first position security interest in the Prepetition Collateral by filing a UCC-1 financing statement with the New York State Secretary of State on December 31, 2001, and filed a continuation on August 15, 2006.

## ii. The Debtor's Need to Use Cash Collateral

42. It is my belief that the Debtor requires the use of cash collateral to fund its day-to-day operations. Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with disastrous consequences for the Debtor, its estate and creditors. Accordingly, the Debtor seeks authority pursuant to section 363(c)(2) of the Bankruptcy Code to use the Prepetition Cash Collateral in the operation of its business and administration of its chapter 11 case. The Debtor has not been able to obtain, in the ordinary course of its business, unsecured credit under section 503(b)(1) of the Bankruptcy Code as an administrative expense sufficient to meet its operating needs.

43. The Debtor received consent from FNB in the form of an agreed emergency interim order to use the Prepetition Cash Collateral (the "Emergency Order") in accordance with the budget attached to the Emergency Interim Order as Exhibit "A."

44. In sum, without immediate access to the Prepetition Cash Collateral, the Debtor faces a liquidity crisis that would threaten the viability of its business. If cash is not available to maintain business-as-usual operations during the critical period immediately following commencement of this case, the Debtor will likely face a substantial, if not devastating, loss of customer support and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of employees and employee morale and deteriorating relationships with suppliers and customers – all of which would adversely affect the value of the Debtor's business. Thus, the ability of the Debtor to remain a viable operating entity and preserve value

1780018.1 12/9/2010

pending the orderly liquidation of its estate, depends upon obtaining the interim and final relief requested in the Cash Collateral Motion.

**E.**     **Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing the Debtor to Pay Prepetition Sales and Use Taxes**

45.     I have reviewed the Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing the Debtor to Pay Prepetition Sales and Use Taxes (the "Sales and Use Taxes Motion"). Based upon my review of the Sales and Use Taxes Motion, I understand that the Debtor seeks an Order from the Court authorizing, but not directing, it to pay prepetition sales, use, payroll, trust fund and other taxes and similar obligations to the respective authorities in the ordinary course of the Debtor's business. Nothing contained in the Sales and Use Taxes Motion, however, would preclude the Debtor from contesting, in its sole discretion, the validity and amount of any prepetition sales and use taxes (collectively, "Sales and Use Taxes") under bankruptcy or non-bankruptcy law.

46.     The Debtor, in the ordinary course of its retail business, incurs various tax liabilities, including Sales and Use Taxes. The Sales and Use Taxes are paid to various taxing authorities (collectively, the "Taxing Authorities") on a periodic basis that is established for each particular tax. To my knowledge, the Debtor is current with respect to the payment of Sales and Use Taxes. A monthly payment of $67,800.00 is due the New York State Department of Taxation and Finance for sales taxes on December 23, 2010 for the period of November 28, 2010 through December 22, 2010. The sum of $31,640.00 in accrued Sales and Use Taxes are owed to the Taxing Authorities as of the Petition Date, which amount is less than the monthly average of approximately $67,800.00.

1780018.1 12/9/2010

47.     While reserving the right to argue to the contrary in particular cases, I am informed that the Debtor generally does not have any legal or equitable interest in funds held to pay Sales and Use Taxes. Moreover, to the extent that these "trust fund" taxes and other amounts are collected from third parties and held for payment to the Taxing Authorities, I am informed that they are not property of the estate. The Debtor, therefore, generally has no equitable interest in funds collected and segregated to pay the Sales and Use Taxes.

48.     Prior to the Petition Date, the Debtor paid the Sales and Use Taxes as they became due to Taxing Authorities. On average, the Debtor's monthly obligations for the Sales and Use Taxes, including for certain taxes and duties owed to certain Taxing Authorities, were collectively and approximately $67,800.00. Nothing contained in the Sales and Use Tax Motion should be construed as impairing, or should be deemed to impair, the Debtor's right to contest the validity or amount of any Sales and Use Taxes that may be alleged to be due; and the Debtor expressly reserves all of its rights with respect thereto.

49.     Further, I am informed that most, if not all, of the Sales and Use Taxes are entitled to priority status under the Bankruptcy Code. The Debtor's payment of the Sales and Use Taxes in the ordinary course of business, in all likelihood, will only affect the timing of the payments and not the amounts to be received by such entities. Therefore, I do not believe that other creditors and parties in interest will be prejudiced by such payment.

50.     Without question, I believe that the payment of the Sales and Use Taxes is necessary to avoid interruption of the Debtor's business activities. A withholding of the payment of the Sales and Use Taxes likely would cause taxing and other authorities to conduct audits and other administrative proceedings, resulting in significant administrative burdens. Prompt and regular payment of the Sales and Use Taxes will avoid these unnecessary government actions.

1780018.1 12/9/2010

51.     Furthermore, authority to pay the Sales and Use Taxes is necessary to avoid subjecting the Debtor's officers and directors to lawsuits during the pendency of this proceeding that would distract from the effort to successfully wind-down the Debtor's operations. Many federal and state statutes provide that various Sales and Use Taxes constitute "trust fund" taxes for which officers and directors of the collecting entity may in certain circumstances be held personally liable. To the extent any accrued Sales and Use Taxes were unpaid as of the Petition Date, the taxing and other authorities in such jurisdictions may attempt to enforce such personal liability provisions against certain of the Debtor's officers and directors. Such potential lawsuits would prove extremely distracting for the Debtors, and for the named officers and directors whose immediate and full-time attention to the Debtor's wind-down process is required. I believe it is in the best interests of the Debtor's estate to eliminate the possibility of such time-consuming and potentially damaging distractions.

52.     I believe that granting the relief requested will enhance the likelihood of the successful liquidation of the Debtor and the probability of maximizing the value of estate assets and, ultimately, the return to creditors. Further, I believe that the timely payment of the Sales and Use Taxes is necessary, is in the best interests of the Debtor's estate and is highly beneficial to the operation of the Debtor's business. Accordingly, the Debtor seeks authority to pay, in its sole discretion, the Sales and Use Taxes to the relevant Taxing Authorities in the ordinary course of business.

1780018.1 12/9/2010

**F. Motion for Order Authorizing (I) Continuation of Debtor's (A) Workers' Compensation Insurance, (B) Commercial General Liability Insurance, (C) Commercial Property and Related Commercial Insurance, (D) Health Insurance, (E) Disability Insurance, and (II) Payment of Prepetition Obligations in Respect Thereof**

53.     I have reviewed the Motion for Order Authorizing (I) Continuation of Debtor's (A) Workers' Compensation Insurance, (B) Commercial General Liability Insurance, (C) Commercial Property and Related Commercial Insurance, (D) Health Insurance, (E) Disability Insurance, and (II) Payment of Prepetition Obligations in Respect Thereof (the "Insurance Motion"). I believe that, if the requested relief is not granted and the Insurance Programs (discussed below) lapse or terminate, the Debtor will be unable to continue its business operations, thereby endangering the Debtor's orderly liquidation and substantially harming all creditors.

54.     In the ordinary course of the Debtor's business, it maintains various liability, property and other insurance (the "Insurance Programs") through several private insurance carriers (the "Insurance Carriers"). The Insurance Programs include coverage for, among other things, workers' compensation claims, personal injury, general liability, property damage and fire, operation of vehicles and various other property-related and general liabilities. All of the Insurance Programs referenced above are discussed more fully in the Insurance Motion and are essential to the ongoing operation of the Debtor's business.

55.     The premiums for most of the Insurance Programs (the "Insurance Premiums") are determined annually and are paid by the Debtor at policy inception or via installments through the policy term directly to the Insurance Carriers or indirectly through brokers. The annual Insurance Premiums under the Insurance Programs aggregate approximately $115,150.00. As of the Petition Date, the approximate sum of $23,729.00 is due and owing for Workers'

1780018.1 12/9/2010

Compensation and Commercial Property Insurance for the December, 2010 monthly premium payments.

56.     Pursuant to the Insurance Programs, the Debtor may be required to pay various deductibles or retention amounts (the "Insurance Deductibles") depending upon the type of claim and insurance policy involved. Under certain policies, the Insurance Carriers may pay claimants and then invoice the Debtor for any Insurance Deductible. In such situations, the Insurance Carriers may have prepetition claims against the Debtor. As of the Petition Date, the Debtor does not believe there are any material prepetition obligations owed to Insurance Carriers relating to Insurance Deductibles but, out of an abundance of caution, the Debtor seeks authority to satisfy any such prepetition obligations.

57.     The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain its Insurance Programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles or related fees under the Insurance Programs could result in one or more of the Insurance Carriers terminating or declining to renew its insurance policies or refusing to enter into new insurance policies with the Debtor in the future. If the Insurance Programs lapse without renewal, the Debtor could be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

58.     In order for the Debtor to maintain its operations in compliance with various legal and contractual obligations, the Debtor must be able to continue its Insurance Programs without disruption. In addition, as directed by the Office of the United States Trustee for the Western District of New York, debtors in chapter 11 cases have a fiduciary obligation and a legal duty to account for their operations of a business, which in part is met "substantially" by "obtaining and

1780018.1 12/9/2010

maintaining insurance" following the Petition Date. The continuation of the Insurance Programs and the payment of all prepetition and post-petition Insurance Obligations arising under the Insurance Programs is therefore essential to preserve the Debtor's business and preserve the value of the Debtor's estate for all creditors. I therefore respectfully request that the Court grant the relief requested in the Insurance Motion in its entirety.

**G.** **Motion Authorizing Debtor (i) to Honor Pre-Petition Customer Deposits by Fulfilling Their Orders and (ii) to Continue Certain Customer Practices**

59.    As part of the Debtor's ordinary business practices, the Debtor sells and redeems gift certificates and gift cards, and provides refunds of Deposits to customers for whom it is unable to fulfill an order.

60.    As of the Petition Date, the Debtor had issued and outstanding gift certificates totaling approximately $9,503.09 and gift cards in the approximate amount of $46,544.30, for a total of $56,047.39.

61.    In addition, the Debtor received deposits from its customers for orders to be filled with merchandise delivered by the Debtor. Customer deposits are currently being held by the Debtor from both individual and commercial customers. Typically, customers place deposits representing 25% of the final purchase price. As of the Petition Date, the Debtor estimates that it is holding approximately $296,962.48 in Deposits for pending customer orders (the "Pre-Sale Orders").

62.    As set forth in the Debtor's Motion Pursuant to 11 U.S.C. § 105(a), 507(a) and 541 for an Order Authorizing the Debtor (i) to Honor Certain Pre-Petition Customer Deposits by fulfilling Their Orders and (ii) to Continue Certain Customer Practices (the "Customer Deposit Motion"), as part of the GOB Sale, PFP will be assisting the Debtors in fulfilling certain orders

1780018.1 12/9/2010

from which the Deposits have been paid to the Debtor. Until the commencement of the GOB Sale, however, the Debtor will endeavor to fulfill as many Pre-Sale Orders as possible for which Deposits have been received from customers.

63.     In addition, the Debtor seeks authorization to continue its practices of redeeming gift certificates and gift cards, and refunding to its customers Deposits made in connection with orders that were ultimately cancelled or unfilled. As of the Petition Date, the Debtor has identified approximately customers who have specifically requested refunds of their Deposits totaling $11,554.00 (the "Deposit Refunds"), customers whose orders have been cancelled or are otherwise unable to be fulfilled who are due store credit or refunds of their Deposits totaling $34,227.73, but who have not contacted the Debtor to request a refund or store credit (the "Undetermined Deposits") and customers who paid Deposits to the Debtor from 2007 through the Petition Date totaling approximately $162,712.00 who have not contacted the Debtor concerning the status of their Deposits or who have not responded to the Debtor's attempts to contact them for instruction (the "Unclaimed Deposits").

64.     The Debtor has segregated the amounts due customers for the Deposit Refunds, the Undetermined Refunds and the Unclaimed Refunds aggregating $208,493.73 in an account at First Niagara Bank (the "Deposit Account"). As discussed in the Customer Deposit Motion, the Debtor requests that it be authorized, but not directed, to honor requests for the refund of Deposits that are not disputed

65.     Redeeming outstanding gift certificates and gift cards and honoring refunds of the Deposits during the pendency of this case will inspire goodwill in the community. Failing to honor these pre-petition practices would result in serious adverse customer reaction and potentially expose the Debtor to regulatory fines and other sanctions by government agencies, all

1780018.1 12/9/2010

to the detriment to the Debtor's operations. I therefore request that the Court grant the relief requested in the Customer Deposit Motion in its entirety.

**H. Motion for Entry of an Order (A) Authorizing Debtor to assume Pre-Petition Executory Contract and (B) authorizing the Debtor to Conduct a Going-Out-of-Business Sale and (C) Granting Other Relief**

66. Pre-petition, as it considered its options concerning its financial issues, the Debtor met with bankers, sought out new investors and explores refinancing options. The Debtor also attempted to reorganize its finances by reducing operating expenses. None of these efforts was ultimately successful.

67. In addition to attempts to obtain financing and/or new capital, the Debtor requested proposals from different liquidation companies. After discussions with such liquidations companies, the Debtor determined that a proposal from Planned Furniture Promotions, Inc. ("PFP") was the highest and best proposal and will result in the greatest return to the Debtor's estate and its creditors, both secured and unsecured.

68. As a result of extensive negotiations, the Debtor and PFP entered into a Sale Promotion Consulting Agreement dated December 3, 2010 (the "PFP Agreement") for the liquidation of the Debtor's inventory (the "Company Inventory") as part of a "Going Out of Business Sale" (the "GOB Sale").

69. Under the terms of the PFP Agreement, PFP will serve as the Debtor's agent for the purpose of conducting the GOB Sale at all the Debtor's sale locations (the "Sale Locations"). As set forth in the PFP Agreement, PFP will:

> (a) provide a team of experienced furniture personnel, including a manager and additional sales personnel for the conduct of the Sale. PFP will also arrange for administrative, clerical and warehouse personnel, as necessary;

1780018.1 12/9/2010

(b) provide assistance and direction with Sale-related operations, including merchandising, display, pricing, staffing, advertising, administrative, sales, delivery, service and other aspects regarding the conduct of the Sale;

(c) make available the benefit of its buying power to provide Additional Inventory for the Sale;

(d) assume responsibility for Sale Expenses, pursuant to the terms and conditions of the Agreement;

(e) arrange for the advance of funds for Sale Expenses, in PFP's discretion, which advances shall be reimbursed from the proceeds of the Sale; and

(f) provide the Debtor and FNB, on a weekly basis, a full and complete accounting of advances made by PFP of any Non-Sale expenses and a reconciliation of the Backlog Account (as defined in the Agreement).

70.     In addition to these aforementioned services, PFP will assist the Debtor in satisfying customer orders for which a deposit was made for Pre-Sale Orders and shall receive a commission of five percent (5%) of the gross sales amount (excluding sales taxes) for completing Pre-Sale Orders.

71.     PFP will pay to FNB, in advance of the GOB Sale, 73% of the value of the Company Inventory and shall pay to the Debtor's estate the sum of $50,000.00 to be used for the benefit of creditors.

72.     Simultaneously with the filing and service of the other First-Day Motions, the Debtor shall file and serve a motion seeking to assume the PFP Agreement and to conduct the GOB Sale (the "GOB Sale Motion"). The Debtor will request that the hearing to consider the GOB Sale Motion be heard on an expedited basis during the week of December 20, 2010. I respectfully submit that the execution of the PFP Agreement is in the best interests of the Debtor's estate and its creditors, and request that the Court issue an order authorizing the Debtor to assume the PFP Agreement and to conduct the GOB Sale.

1780018.1 12/9/2010

I swear, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
Dean J. Rallo

Sworn to before me this
9th day of December, 2010.

_____
Notary Public

ANDREA D. WIK
Notary Pub    of New York
Quali  c     County
My Commission Expires  9/07/13

1780018 1 12/8/2010